1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PEYMAN PAKDEL, et al.,

    Plaintiffs,

v.

CITY AND COUNTY OF SAN
FRANCISCO, et al.,

    Defendants.

Case No.  17-cv-03638-RS

**ORDER GRANTING IN PART AND
DENYING IN PART MOTION TO
DISMISS FIRST AMENDED
COMPLAINT**

## I. INTRODUCTION

Plaintiffs filed suit against the City and County of San Francisco ("the City") to challenge the enforcement of a city ordinance requiring them to offer a lifetime lease to a tenant as part of the process for converting their tenancy in common into a condominium. After the initial Complaint was dismissed by this Court and the Ninth Circuit affirmed, the Supreme Court vacated the Ninth Circuit's ruling and remanded the case for further proceedings. Plaintiffs then filed their First Amended Complaint ("FAC"), which avers that the City's ordinance violates the Takings Clause of the Fifth Amendment and constitutes an unlawful seizure in violation of the Fourth Amendment. The City once again moves to dismiss for failure to state a claim.

The City's motion is granted in part and denied in part. Plaintiffs have failed to state a claim for a private taking, a *per se* physical taking, a regulatory taking, or an unconstitutional seizure, and their claims for injunctive and declaratory relief are precluded by Supreme Court precedent. However, their unconstitutional condition claim is pleaded sufficiently.

United States District Court
Northern District of California

## II. BACKGROUND

### A.  Factual Background[1]

Plaintiffs Peyman Pakdel and Sima Chegini are a married couple currently residing in Ohio. In 2009, they purchased a tenancy-in-common ("TIC") interest in a six-unit apartment building in San Francisco, which gave them the right to occupy one of the units. Since Plaintiffs purchased their TIC interest with the intent to retire in San Francisco, they decided to rent their unit to a residential tenant beginning in 2010. Plaintiffs' TIC agreement obligates them to "take all steps necessary to convert the Property to condominiums and to share the expenses of the conversion to condominiums equally with the other co-tenants." Dkt. 49 ("FAC") ¶ 11. Condominium conversion would have the effect of transferring the six-unit TIC into six individual and separately alienable condominiums, likely creating significant economic value for the building owners. See Dkt. 52-2, Ex. A ("Ordinance"), at 3.[2]

At the time Plaintiffs purchased their TIC interest, the City required all property owners seeking condominium conversion to enter a lottery. However, this process changed in 2013 when the San Francisco Board of Supervisors enacted Ordinance 117-13 ("the Ordinance"). The Ordinance temporarily halted the lottery and replaced it with a new process, referred to as the Expedited Conversion Program ("ECP"), intended to help clear the substantial backlog of TICs applying for conversion each year. See Ordinance, at 2–3. Under the ECP, those seeking conversion were required to provide "a written offer to enter into a lifetime lease with [any] non-owning tenants." FAC ¶ 14. The non-owning tenant could choose to accept or refuse the offer; in the event the tenant accepted the offer, the property owner would be required to execute and record the lease "prior to the time of final map approval for the condominium conversion." Id.

Plaintiffs and their co-tenants had entered the conversion lottery for several years before

---

[1] The factual background is based on the averments in the FAC, which must be taken as true for purposes of this motion, and documents of which the Court may take judicial notice. United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003).

[2] The City's request that the Court notice Ordinance No. 113-17 is granted. See Dkt. 52-2, Ex. A.

ORDER ON MOTION TO DISMISS
CASE NO. 17-cv-03638-RS

the ECP went into effect, to no avail. The ECP offered the opportunity to secure the conversion of

Plaintiffs' building into condominiums, but it came at a cost: Plaintiffs would have to offer their

tenant a lifetime lease, which they didn't want to do given that they intended to use their unit as a

retirement home. The ECP, however, did not offer any exemptions. Plaintiffs therefore "offered

$100,000 to their tenant to buy him out of the lease." *Id.* ¶ 21. The tenant refused and

counteroffered to purchase the unit outright for $1.03 million, but Plaintiffs refused. Instead, they

followed the process prescribed by the ECP: they submitted the lifetime lease documents in March

2015 and, in November 2016, confirmed with the City that they would provide the tenant with the

lifetime lease. The conversion process wrapped up on March 25, 2017, when the condominium

deeds were recorded. On May 5, 2017, the tenant submitted an executed lifetime lease to

Plaintiffs. On June 9, 2017, and June 13, 2017, Plaintiffs "requested that the City not require them

to execute and record the lifetime lease under the Ordinance, or in the alternative to compensate

them for transferring a lifetime lease interest in their Property." *Id.* ¶ 30. The City refused and, on

June 12 and 13, 2017, notified Plaintiffs that their failure to execute and record the lease would be

considered a violation of the Ordinance and result in a potential enforcement action.[3]

### B.  Procedural Background

After the City refused to exempt them from the lifetime lease requirement, Plaintiffs sued

the City (specifically, the San Francisco Board of Supervisors, the San Francisco Department of

---

[3] The City separately submitted each of the official documents cataloguing Plaintiffs' application
and recording process. Given that these documents complement the averments in the FAC, and
that they are public records properly subject to judicial notice, *see Ritchie*, 342 F.3d at 909, The
City's request that the Court notice Exhibits B, C, D, E, F, H, I, J, and K is granted. *See* Dkt. 52-2.
Its request is denied as to Exhibits G, L, and M. The City's separate request for judicial notice of
Plaintiffs' opposition to the City's motion to dismiss the original Complaint is denied as
unnecessary. *See* Dkt. 62.

Plaintiffs requested the Court notice an analysis on condominium conversion produced for the
City by a team of consultants, and a report by the San Francisco Planning Department regarding
conversion of Plaintiffs' building. *See* Dkt. 60, Exs. A, C. These requests will be treated instead as
seeking incorporation by reference and granted in that respect only. *See Khoja v. Orexigen
Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). Judicial notice of a letter sent by the City
following the suspension of the ECP due to this suit is irrelevant to the disposition of this motion,
and therefore that request is denied, without prejudice. *See* Dkt. 60, Ex. B.

United States District Court
Northern District of California

Public Works, twenty-five unnamed individuals, and the City and County itself) in this District. The suit averred that the Ordinance violated California law and several constitutional provisions, including the Fourteenth Amendment Due Process Clause, the Equal Protection Clause, the Takings Clause, and the Fourth Amendment. *See* U.S. CONST. amends. IV, V, XIV. The City moved to dismiss, and this Court granted the motion. *See* Dkt. 25. The Order concluded that Plaintiffs had not exhausted their state remedies under the rules prescribed by *Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172 (1985), and thus their Takings Clause claims were not ripe. It also held that Plaintiffs had failed to state adequately their non–Takings Clause claims, and that their state law claims were procedurally barred.

A Ninth Circuit panel affirmed in March 2020. The panel noted that, in 2019, the Supreme Court overturned *Williamson County*'s "state-litigation" exhaustion requirement but concluded its "finality requirement" had survived. *See Pakdel v. City & Cnty. of San Francisco*, 952 F.3d 1157, 1163 (9th Cir. 2020) (discussing *Knick v. Twp. of Scott*, 139 S. Ct. 2162 (2019)). It thus affirmed that Plaintiffs' takings claims were not ripe, although on the separate ground that the City had not reached a "final" decision as to the Pakdels' property. *See id.* at 1160, 1165–68. It also affirmed the dismissal of Plaintiffs' other constitutional claims. *See Pakdel v. City & Cnty. of San Francisco*, 798 Fed. App'x 162, 162–63 (9th Cir. 2020). The Ninth Circuit then denied rehearing en banc. *See Pakdel v. City & Cnty. of San Francisco*, 977 F.3d 928 (9th Cir. 2020) (en banc).

In 2021, the Supreme Court granted Plaintiffs' petition for a writ of certiorari and, in a per curiam decision, vacated the Ninth Circuit panel's ruling. *See Pakdel v. City & Cnty. of San Francisco*, 141 S. Ct. 2226, 2231 (2021). The Court held the City's decision was in fact "final" such that Plaintiffs' suit could proceed. *See id.* at 2230. On remand, the Ninth Circuit vacated its prior holdings and remanded the case to this Court in accordance with both the Supreme Court's *Pakdel* decision and its recent holding in *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021). *See* 5 F.4th 1099, 1099 (9th Cir. 2021).

Plaintiffs then filed their FAC on January 5, 2022, raising five claims for relief: (1) taking of private property for a private purpose; (2) unconstitutional physical taking; (3) unconstitutional

condition; (4) unconstitutional regulatory taking; and (5) unconstitutional seizure of property. Plaintiffs seek damages, a series of declaratory judgments, injunctive relief from the Ordinance, and a stay of enforcement of the lifetime lease agreement, as well as attorneys' fees and costs. The City subsequently brought the present motion to dismiss.

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) governs motions to dismiss for failure to state a claim. A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations" are not required, a complaint must have sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)). When evaluating such a motion, courts generally "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

### IV. DISCUSSION

#### A.  The Takings Clause

Four of Plaintiffs' five claims for relief center around the contention that the Ordinance violates the Takings Clause of the Fifth Amendment. Under that constitutional provision, the federal government — as well as state and local governments, by operation of the Fourteenth Amendment — are prohibited from taking private property for public use without paying just compensation. *See* U.S. CONST. amend. V. The Supreme Court has recognized two broad categories of takings: physical takings and regulatory takings. In a *per se* physical taking, the government "has physically taken property for itself or someone else[,] by whatever means." *Cedar Point*, 141 S. Ct. at 2072. Most intuitively, this category applies when the government uses its powers of eminent domain to condemn property formally, or when the government "physically takes possession of property without acquiring title to it." *Id.* at 2071; *see, e.g.*, *United States v.*

*Pewee Coal Co.*, 341 U.S. 114 (1951) (plurality opinion) (physical taking occurred where federal government took possession of coal mine via presidential executive order); *United States v. General Motors Corp.*, 323 U.S. 373 (1945) (physical taking occurred where federal government used condemnation proceedings to gain access to portion of privately owned warehouse). This category extends further to encompass generally all "government-authorized invasions of property," *Cedar Point*, 141 S. Ct. at 2074, even those that are limited in duration or that cause only trivial economic loss. *See, e.g.*, *United States v. Causby*, 328 U.S. 256 (1946) (physical taking occurred due to military aircraft flying over privately owned farm); *United States v. Cress*, 243 U.S. 316 (1917) (physical taking occurred after government built dam, resulting in flooding of plaintiff's property); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) (local ordinance requiring landlords to allow cable companies to install equipment on landlords' properties effected physical taking despite only trivial economic loss).

Most recently, in *Cedar Point Nursery v. Hassid*, the Supreme Court held that a California regulation requiring agricultural employers to allow union organizers to enter their properties for three hours a day, up to 120 days a year, constituted a physical taking. 141 S. Ct. at 2072. The Court concluded that the regulation "appropriate[d] a right to physically invade the growers' property" to the organizers, *id.* at 2074, and "appropriat[ed] the growers' right to exclude" without providing compensation, *id.* at 2076. In so doing, the regulation effectively (if not formally) granted the union organizers an easement to enter the growers' land. *See id.*

The second recognized category of takings — regulatory takings — encompasses restrictions by government on "a property owner's ability to use [their] own property." *Id.* at 2072 (citing *Tahoe-Sierra Pres. Council v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 321–23 (2002)). Some government regulations, namely those that effectively "den[y] all economically beneficial or productive use of land," are, just like physical takings, *per se* unconstitutional and require the government to pay just compensation. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015–16 (1992) (citing cases). Most land use regulations, however, "necessarily entail[] complex factual assessments of the purposes and economic effects of government actions." *Tahoe-Sierra*, 535 U.S.

United States District Court
Northern District of California

at 323 (quoting *Yee v. Escondido*, 503 U.S. 519, 523 (1992)). This inquiry has generally involved applying the three-part balancing test prescribed by *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978): the court must "balanc[e] factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." *Cedar Point*, 141 S. Ct. at 2072 (citing *Penn Central*, 438 U.S. at 124). Courts have applied *Penn Central* to a broad range of regulations — from zoning ordinances, *see, e.g.*, *Bridge Aina Le'a, LLC v. Haw. Land Use Comm'n*, 950 F.3d 610 (9th Cir. 2020); to landlord-tenant laws, *see, e.g.*, *Ballinger v. City of Oakland*, 24 F.4th 1287 (9th Cir. 2022); to COVID-19 restrictions, *see, e.g.*, *Metroflex Oceanside LLC v. Newsom*, 532 F. Supp. 3d 976 (S.D. Cal. 2021); to regulations of IOLTA trust accounts, *see, e.g.*, *Wash. Legal Found. v. Legal Found. of Wash.*, 271 F.3d 835 (9th Cir. 2001).

In addition to these two categories of direct takings, the Supreme Court has also held that "the government may not require a person to give up a constitutional right — here the right to receive just compensation when property is taken for public use — in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the property." *Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994); *see Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825 (1987); *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013). Such conditions or exactments are unconstitutional attempts to evade the Takings Clause. While the government may require exactments from a property owner in exchange for granting a permit, any exactment must have both "an essential nexus and rough proportionality" to the impacts of the owners' desired use. *Koontz*, 570 U.S. at 606; *see also Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 548 (2005) ("[T]he issue [i]s whether the exactions substantially advance the *same* interests that land-use authorities asserted would allow them to deny the permit altogether.").

Finally, as noted in the text of the Fifth Amendment itself, governments may only effect takings that are for "public use." U.S. CONST. amend. V. This means, for example, the government may not transfer private property from one party for the sole purpose of benefitting another private party, even if the former is paid just compensation. *See Kelo v. City of New London*, 545 U.S. 469,

477 (2005). However, the Supreme Court has instructed courts to construe the public use requirement with substantial deference to the government, noting that legislatures must be afforded "broad latitude in determining what public needs justify the use of the takings power." *Id.* at 483; *see also id.* at 488 ("When the legislature's purpose is legitimate and its means are not irrational, our cases make clear that empirical debates over the wisdom of takings . . . are not to be carried out in the federal courts." (quoting *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 242–43 (1984))). For instance, the Ninth Circuit, applying *Kelo v. City of New London*, concluded that a rent stabilization ordinance for mobile home parks did not constitute a private taking, as the ordinance was "rationally related to a conceivable public purpose." *MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1129 (9th Cir. 2013).

**B.  Fifth Amendment Claims**

       1.  <u>Private Taking/Violation of Public Use Requirement</u>

Plaintiffs aver, in Claim 1, that the Ordinance violates the public use requirement of the Fifth Amendment. They state that it "requires Plaintiffs to transfer a lifetime lease interest in his [sic] Unit to a private person, namely, his [sic] tenant," and that this therefore "benefits private persons, not the general public." FAC ¶¶ 36–37. Any public benefits the Ordinance may have, Plaintiffs argue, are only "incidental." *Id.* ¶ 37. Given the significant deference afforded the City under *Kelo* and its progeny, Plaintiffs have an uphill battle to state a plausible claim for a private taking. They have not met their burden. The FAC makes conclusory statements tracing the elements of a private taking claim, but it fails to offer any support for these conclusions. There is nothing in the FAC from which to conclude the ECP was adopted for the sole purpose of transferring property from one private person to another or to otherwise violate the public use requirement. *See Kelo*, 545 U.S. at 477.

The text of the Ordinance itself affirms that Plaintiffs have not stated a valid private taking claim. The San Francisco Board of Supervisors, in creating the ECP, expressly found that increased condominium conversions, without protections for existing non-owner tenants, would result in significant displacement. *See* Ordinance, at 4. Notwithstanding Plaintiffs' disagreements

with the wisdom of the lifetime lease requirement, the City's actions were clearly rationally related to the purpose of preventing tenant displacement. *See MHC Fin. Ltd. P'ship*, 713 F.3d at 1129; *see also* Dkt. 25, at 6 ("To look beyond the plain language of the Ordinance's stated purpose would entail an unwarranted second-guess of the policy decisions of San Francisco's elected officials."). The City's motion is thus granted with respect to Claim 1, with leave to amend.

### 2.  *Per Se* Physical Taking

Plaintiffs next argue, in Claim 2, that the Ordinance amounts to a *per se* physical taking because it "functions as a straight-out governmental demand that Plaintiffs give a lifetime lease to their tenant" and "appropriates a life tenancy from the Plaintiffs to their tenant." FAC ¶ 46. The City contends that this case should not be examined through the lens of a *per se* physical taking because the Ordinance regulates the landlord-tenant relationship, and courts have long declined to recognize physical takings in such regulations. *E.g.*, *Ballinger*, 24 F.4th at 1292 (no physical taking where city required landlords to pay tenants a relocation fee); *Farhoud v. Brown*, No. 20-cv-2226, 2022 WL 326092, at *10 (D. Or. Feb. 3, 2022) (COVID-19 eviction moratorium did not constitute physical taking); *see also Yee v. City of Escondido*, 503 U.S. 519 (1992); *FCC v. Fla. Power Corp.*, 480 U.S. 245 (1987). Plaintiffs argue these cases are distinguishable and, importantly, they argue the Ordinance is the "different" (i.e., exceptional) case identified by *Yee v. City of Escondido*: there, in declining to recognize a physical taking in a city rent control statute, the Supreme Court noted that "[a] different case would be presented were the statute, on its face or as applied, to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy." 503 U.S. at 528.

The common thread that runs through these landlord-tenant cases is the notion that a *per se* physical taking has not occurred because the element of "required acquiescence" is absent. In other words, unlike instances in which the government has required a property owner to submit to occupation by the government or a third party, a landlord has *voluntarily* invited a tenant to occupy their land. *See, e.g.*, *Yee*, 503 U.S. at 527; *Fla. Power Corp.*, 480 U.S. at 252 ("This element of required acquiescence is at the heart of the concept of occupation."). Plaintiffs have not

United States District Court
Northern District of California

United States District Court
Northern District of California

1  adequately shown why this logic is not similarly applicable here. Not only did they voluntarily

2  rent out their property in the first place, Plaintiffs also voluntarily applied (along with their fellow

3  tenants in common) to convert their building into a condominium through the ECP. The City did

4  not command them to do either. Thus, to the extent Plaintiffs claim they were compelled to enter

5  the ECP, it was the threat of suit by their co-tenants that compelled them — not the City.

6        For the same reason, Plaintiffs have not adequately shown why this is the "different case"

7  contemplated by *Yee*. Even if the Ordinance were to "compel [Plaintiffs] over objection to rent

8  [their] property or to refrain in perpetuity from terminating a tenancy," a conclusion on which this

9  Order takes no position, that would not change the fact that Plaintiffs still elected to apply for a

10  condominium conversion. The "different case," in other words, might arise where the City

11  required *all* landlords (or a subset of them) to offer lifetime leases to their tenants; but where, as

12  here, the City requires only those landlords *voluntarily applying for condominium conversions* to

13  offer their tenants lifetime leases, the landlord cannot plausibly complain of a physical taking.

14        Plaintiffs also analogize to *Cedar Point* by suggesting that the Ordinance appropriates a

15  life tenancy to their tenant in the same way the California regulation in that case appropriated an

16  easement to union organizers. There is no reason to believe *Cedar Point* stretches that far. For one,

17  the crucial absence of "required acquiescence" makes this case readily distinguishable. Further, as

18  the City notes, courts following *Cedar Point* have not recognized any such dramatic extension of

19  physical takings jurisprudence. Indeed, the Ninth Circuit recently concluded, in *Ballinger v. City*

20  *of Oakland*, that a city ordinance requiring landlords to pay tenants a relocation fee should not be

21  analyzed as a physical taking, notwithstanding *Cedar Point*. *See* 24 F.4th at 1293–94. As such,

22  what matters is not whether Plaintiffs have invoked the particular terminology of property interests

23  (e.g., by alleging the City has "appropriate[d] a life tenancy" from Plaintiffs to the tenant, FAC

24  ¶ 46), but whether the government has "require[d] the landowner to submit to the physical

25  occupation" of their property. *Ballinger*, 24 F.4th at 1293 n.3 (emphasis omitted) (quoting *Yee*,

26  503 U.S. at 527). Given their voluntary choice to participate in the ECP, Plaintiffs have failed to

27  state a claim for a physical taking. Claim 2 is therefore dismissed, with leave to amend.

28

### 3. Regulatory Taking

Plaintiffs further argue in Claim 4 that, to the extent the Ordinance does not amount to a physical taking, it nevertheless constitutes a regulatory taking under *Penn Central*. Although the *Penn Central* balancing test is necessarily quite fact specific, federal courts often examine these factors at the motion to dismiss stage to assure plaintiffs have satisfied their burden to establish the plausibility of their claims. *See, e.g.*, *Lebanon Valley Auto Racing Corp. v. Cuomo*, 478 F. Supp. 3d 389, 401 (N.D.N.Y. 2020); *Northland Baptist Church of St. Paul v. Walz*, 530 F. Supp. 3d 790, 816–17 (D. Minn. 2021). Thus, notwithstanding some of the thornier questions inherent in conducting a *Penn Central* analysis, it is appropriate to review Plaintiffs' averments to ensure they hold water. Upon closer inspection, it is apparent they do not.

Plaintiffs argue the first *Penn Central* factor has been established based on the averment that the lifetime lease interest will diminish their property's value by "more than $500,000." FAC ¶ 27. Assuming (without deciding) that Plaintiffs' individual unit, rather than the entire building, is the proper "parcel" to analyze, *cf. S. Nassau Build. Corp. v. Town Bd. of Town of Hampstead*, No. 21-cv-00715, 2022 WL 3446317, at *8–10 (E.D.N.Y. Aug. 17, 2022) (discussing *Murr v. Wisconsin*, 137 S. Ct. 1933 (2017)), the FAC does not include any facts to establish the basis for this averred diminution in value. Plaintiffs claim, in their opposition to the City's motion, that this amounts to a loss in value of "over 50 percent." Dkt. 59 ("Opp."), at 19–20. Even assuming Plaintiffs had stated this in the FAC itself (which they did not), it would undermine rather than help their case. Plaintiffs state that their tenant offered them $1.03 million for the unit before the conversion occurred. FAC ¶ 21. If this indeed represents a minimum value for their unit,[4] a decrease of at least $500,000 would suggest the unencumbered value of their unit would be

---

[4] The FAC does not state the purchase price of Plaintiffs' unit.

United States District Court
Northern District of California

1    roughly $1.53 million.[5] Yet this would reflect a decrease of only around 33 percent[6] — not the 50

2    percent Plaintiffs claim. As the City notes, this would fall far short of the typical diminution

3    threshold for a regulatory taking under Ninth Circuit precedent. *See Colony Cove Properties, LLC*

4    *v. City of Carson*, 888 F.3d 445, 451 (9th Cir. 2018) (noting courts have rejected finding

5    regulatory takings for diminutions "ranging from 75% to 92.5%"). To the extent factors beyond

6    sale value can be included in the diminution analysis, *see id.*, Plaintiffs have not averred any exist

7    here. This factor, then, weighs heavily against Plaintiffs.

8           Plaintiffs' pleadings on the second factor fare no better. They aver the Ordinance has

9    interfered with their expectations to be able to use the unit as a retirement property without it

10   being saddled by a lifetime lease. *See* FAC ¶ 69. Regardless of when in time Plaintiffs'

11   expectations should be considered — when Plaintiffs bought the unit, or when they applied for the

12   ECP — the FAC largely fails to state adequately why Plaintiffs' expectations were plausibly

13   reasonable. As the City and amici note, Plaintiffs' decision to purchase a TIC interest and

14   subsequently rent it out represented a choice to enter a highly regulated field. *See Concrete Pipe &*

15   *Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 645–46 (1993).

16   While Plaintiffs may not have anticipated that converting their TIC interest into a condominium in

17   2017 would specifically require them to extend a lifetime lease to their tenant, any expectation that

18   they would be "continually unencumbered by government regulation" would be unreasonable.

19   *Rancho de Calistoga v. City of Calistoga*, 800 F.3d 1083, 1090 (9th Cir. 2015). Granted, this

20   factor must consider the extent to which the challenged regulation departs from or extends beyond

21

22   _____

23   [5] This figure could derive instead from a Zillow listing that Plaintiffs cite to in their opposition to
     the City's motion for the proposition that "the current value of the unit, which do[es] not take into
24   account a lifetime lease covenant, ranges from $1.52 million to $2.13 million." Opp., at 20. The
     City objects to this footnote, in the form of an opposition to a request for judicial notice and a
25   request to strike it from the record. *See* Dkt. 63. Plaintiffs have not sought judicial notice or
     incorporation by reference of this estimate, and the listing was not included in the FAC and
26   therefore cannot be used to form a basis of Plaintiffs' claim. The City's request is thus denied as
     moot.

27   [6] $1 - (1,030,000/1,530,000) \approx 0.33$, or 33%.

28

past or conceivable future regulatory developments. *See, e.g.*, *Kaiser Aetna v. United States*, 444 U.S. 164, 178 (1979). Yet the FAC does not adequately allege why the ECP's lifetime lease requirement reached this extreme level. Finally, Plaintiffs do not argue that they were unaware of the ECP's requirements at the time they applied for condominium conversion; indeed, it would be unreasonable for them to have believed they could avoid the lifetime lease requirement once they submitted their application. *Cf. Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1006–07 (1984). The second factor thus weighs in the City's favor as well.

Finally, Plaintiffs broadly aver the character of the Ordinance weighs in favor of finding a regulatory taking, since it requires them to continue renting the unit to their tenant and thus "submit to the physical occupation of their property." FAC ¶ 70. This argument carries little weight in light of the analysis above concluding the Ordinance does not constitute a physical taking. While the exact contours of the third factor are "elusive," *Sherman v. Town of Chester*, 752 F.3d 554, 565 (2d Cir. 2014), the *Penn Central* Court recognized that regulations that "adjust[] the benefits and burdens of economic life to promote the common good" are less likely to be deemed regulatory takings than those regulations that "can be characterized as a physical invasion." *Penn Central*, 438 U.S. at 124. Plaintiffs have not adequately identified why the Ordinance should fall into the latter category, rather than the former. Thus, the third factor, too, weighs against them.

There is no particular balance of factors or "set formula" required to find a *Penn Central* violation; it is by its nature a flexible framework. *Ruckelshaus*, 467 U.S. at 1005; *see also* John D. Echeverria, *Making Sense of* Penn Central, 23 UCLA J. ENVT'L L. & POL'Y 171, 208 (2005). Yet given that each factor weighs against the Plaintiffs, and especially given the lack of a plausible showing of diminution in value, there is no other conclusion than that Plaintiffs have not plausibly averred a regulatory taking. *Cf. Guggenheim v. City of Goleta*, 638 F.3d 1111, 1120–22 (9th Cir. 2010); Echeverria, *supra*, at 208–09 ("[A] takings claim will presumably fail if all three factors point in favor of the government . . . . Assuming no permanent physical occupation is involved, unless the regulation eliminates all or substantially all of the property's value, there will generally be no taking."). The City's motion is therefore granted, but since additional facts could remedy these pleading deficiencies, Plaintiffs are granted leave to amend.

United States District Court
Northern District of California

4.   Unconstitutional Condition/Exaction

Plaintiffs argue in Claim 3 that the lifetime lease requirement is an unconstitutional condition. The Ninth Circuit has held that the "starting point to [the] analysis of exactions claims is . . . whether the substance of the condition . . . would be a taking independent of the conditioned benefit." *Ballinger*, 24 F.4th at 1300 (internal quotation marks omitted) (citing *Cedar Point*, 141 S. Ct. at 2073; and *Koontz*, 570 U.S. at 612). So here, the first question is whether it would have been a taking if the City had commanded Plaintiffs to offer their tenant a lifetime lease. This is a different proposition than what has been discussed thus far; in this hypothetical, Plaintiffs would be compelled to offer the lifetime lease not by their choice to apply for ECP, but simply by the fact that they had a tenant in the first place. This is a difficult question that would ultimately turn on a variety of considerations, but for the sake of surviving a motion to dismiss, Plaintiffs have plausibly averred that this would constitute a taking. *Cf. Yee*, 503 U.S. at 528.

Having cleared this first hurdle, Plaintiffs must also aver that the lifetime lease requirement lacks either a plausible "essential nexus" with the condominium conversion or "rough proportionality" to the impacts of the conversion. *See Koontz*, 570 U.S. at 606. An "essential nexus" is clearly present for the same reason that Claim 1 was dismissed: the record, which includes the Ordinance itself, adequately articulates how the lifetime lease requirement would help prevent any displacement that might occur as a result of Plaintiffs' condominium conversion. *See* Ordinance, at 4. That said, Plaintiffs have adequately pleaded that the lifetime lease requirement is not "roughly proportionate" to the impact of converting their condominium. Whether the "market effect of a potential withdrawal of Plaintiffs' Unit" due to conversion would in fact be "infinitesimally small," as Plaintiffs aver, is not a question to resolve at the motion to dismiss stage. *See* FAC ¶ 58. As such, Plaintiffs have adequately pleaded their claim, and the motion is denied as to Claim 3.

**C. Fourth Amendment Seizure**

Plaintiffs argue in Claim 5 that the Ordinance effects an unreasonable seizure in violation of the Fourth Amendment. This claim is a nearly verbatim restatement of Plaintiffs' Fourth

United States District Court
Northern District of California

1    Amendment claim in their original Complaint. *Compare* FAC ¶¶ 76–82, *with* Dkt. 1 ¶¶ 68–74.

2    The order dismissing the original Complaint addressed the merits of this claim directly,

3    concluding that Plaintiffs had "fail[ed] to identify any basis for alleging that the City was

4    responsible for coercing them into doing anything." Dkt. 25, at 11. "[T]he City did not force

5    [P]laintiffs to initiate the ECP application process," and thus Plaintiffs had "not allege[d] an

6    involuntary seizure within the meaning of the Fourth Amendment." *Id.* Plaintiffs have provided no

7    reason nor additional factual averments suggesting why this conclusion should not still hold as to

8    the FAC, and nothing in *Cedar Point* impacts this analysis. Claim 5 is therefore dismissed,

9    without leave to amend.

10       **D.  Declaratory and Injunctive Relief**

11           Finally, the City argues that Plaintiffs' claims for declaratory and injunctive relief should

12   be dismissed. Relying on *Knick v. Township of Scott*, the City argues such equitable relief is

13   typically foreclosed when "an adequate provision for obtaining just compensation exists." 139 S.

14   Ct. at 2176. Plaintiffs, in their opposition, generally contend that this question should not be

15   determined on a motion to dismiss. This argument is unpersuasive. For one thing, federal courts

16   have consistently denied equitable relief for takings claims — a trend the *Knick* Court noted dates

17   to the 1870s. *See id.*; *Ruckelshaus*, 467 U.S. at 1016 ("Equitable relief is not available to enjoin an

18   alleged taking of private property for a public use, duly authorized by law, when a suit for

19   compensation can be brought against the sovereign subsequent to the taking." (footnote omitted)).

20   Plaintiffs do not aver monetary damages would be inadequate to make them whole. The fact that

21   the "Supreme Court has had 'no occasion to discuss what remedies might be available for a[n] . . .

22   unconstitutional conditions violation'" only reinforces that the default rule — that is, no equitable

23   relief — should control unless and until the Supreme Court or the Ninth Circuit instructs

24   otherwise. Opp., at 25 (quoting *Koontz*, 570 U.S. at 609). The fact that the authority weighs so

25   heavily against Plaintiffs' claim makes it suitable for disposition on a motion to dismiss, as other

26   courts have done. *See, e.g.*, *Farhoud*, 2022 WL 326092, at *10–11. Plaintiffs' claims for

27   declaratory and injunctive relief are therefore dismissed, and because the defect is one of legal

28

theory, not factual insufficiency, Plaintiffs are not granted leave to amend.

## V. CONCLUSION

For the foregoing reasons, the motion to dismiss is granted in part and denied in part. Claims 1, 2, and 4 are dismissed, with leave to amend. The motion is further granted as to Claim 5 and Plaintiffs' claims for declaratory and injunctive relief, without leave to amend. The motion is denied as to Claim 3. Any amended complaint must be filed within 21 days of the date of this Order.

**IT IS SO ORDERED**.

Dated: October 25, 2022

RICHARD SEEBORG
Chief United States District Judge